IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| PATRICK HARRINGTON, *et al.*, | |
| Plaintiffs, | Civil No. 21-04990 (RBK/SAK) |
| v. | **OPINION** |
| NORTHFIELD BOARD OF EDUCATION, *et al.*, | |
| Defendants. | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendants' Motion to Dismiss (ECF No. 11). For the reasons discussed herein, Defendants' Motion is **GRANTED in part.**

**I.     BACKGROUND**

Plaintiffs Patrick Harrington and Kimberly Gitto-Harrington ("the Parent Plaintiffs") are the parents of two minor children, L.H. and P.H. (together "Plaintiffs"). (ECF No. 8, Am. Compl. ¶ 1). Plaintiffs bring this suit on behalf of themselves and their minor children. (*Id.*)

Defendant Northfield Board of Education ("the Board") is a nine-member Board of Education responsible for the operation of public preschool, elementary, and middle schools in Northfield, New Jersey, collectively referred to as Northfield Community School ("NCS"). (*Id.* ¶ 2). Defendant Maureen Vaccaro was the elementary school principal at NCS, which L.H. attended from 2018 to 2019. (*Id.* ¶¶ 4, 11). Defendant Kelli Kern was L.H.'s kindergarten teacher at NCS from 2018 to 2019. (*Id.* ¶¶ 3, 11). Defendant Pedro Bretones was superintendent of NCS during the relevant period. (*Id.* ¶ 5).

1

L.H. was placed in Defendant Kern's kindergarten classroom at NCS for the 2018-2019 school year. (*Id.* ¶ 16). During an October 2018 meeting between Defendant Kern and the Parent Plaintiffs, Defendant Kern indicated that L.H. was having difficulties "keeping up in the classroom." (*Id.* ¶ 17). After this meeting, L.H. got glasses and Defendant Kern voiced no further concerns about L.H. (*Id.* ¶ 18). In February 2019, Defendant Kern notified the Parent Plaintiffs that "L.H. had fallen significantly behind his peers and recommended he receive 'pull-out' basic skills instruction." (*Id.*) The Parent Plaintiffs began supplementing L.H.'s education at home. (*Id.* ¶ 24). Plaintiffs allege "L.H. was eager to learn and his success from that instruction in a matter of days put him back on track[,]" (*id.*), and that "[b]y the end of February, L.H.'s Parents felt that L.H. had made great strides academically[,]" (*id.* ¶ 26). Still, Defendant Kern suggested to the Parent Plaintiffs that L.H. be held back in kindergarten. (*Id.* ¶ 27). The Parent Plaintiffs "did not believe holding L.H. back was appropriate, given his recent success." (*Id.* ¶ 31).

Defendant Kern then informed the Parent Plaintiffs that L.H. had been referred to a Child Study Team for evaluation. (*Id.* ¶ 32). Several new issues of concern were included in the Child Study Team referral. (*Id.* ¶ 33). Plaintiff Patrick Harrington sought a meeting with school staff to discuss the new issues identified in the referral. (*Id.* ¶¶ 34–36). In that meeting, which took place on March 20, 2019, "NCS staff present explained that some of the listed issues had not occurred in months and those present agreed they should no longer be listed, and some issues could not be explained by those present." (*Id.* ¶ 37). Plaintiffs allege that "without the issues that were no longer relevant and the ones that could not be explained, there was no basis for the referral to the child study team[.]" (*Id.* ¶ 38) At this March 20 meeting, Defendant Kern allegedly stated that she was "not 'getting paid more' or 'getting a bonus' to educate L.H. and therefore it should not require extra effort on her part." (*Id.* ¶ 40).

Plaintiffs allege that, at some point during the 2018-2019 school year, L.H. informed his parents that Defendant Kern "intentionally bullied and mocked him in front of his peers on a near daily basis." (*Id.* ¶ 44). Specifically, L.H. allegedly told his parents that Defendant "Kern told L.H., in front of his class, that he didn't color or draw well, that she became furious at him when he wrote letters or numbers backwards while learning how to properly write them[,]" (*id.* ¶ 46), and would force L.H. to read in front of the class "where the class would insult, mock and bully him," (*id.* ¶ 50). Plaintiffs also allege that Defendant Kern "frequently made unwanted physical contact" with L.H., and "publicly coddled L.H., hugged him and called him by pet names…causing substantial and permanent mental health injuries." (*Id.* ¶¶ 55–57). According to Plaintiffs, "L.H. would come home more traumatized each day" due to this abuse. (*Id.* ¶ 43).

On March 29, 2019, Plaintiff Patrick Harrington met with Defendant Bretones. (*Id.* ¶ 62). In that meeting, Mr. Harrington indicated that "L.H. was suffering severe mental health issues as a result of the abuse L.H was suffering in Kern's classroom which, among other things, limited his ability to learn." (*Id.* ¶ 63). Given "the severe mental health impairment and disability he had developed in Kern's classroom as a result of Kern's abuse of L.H[,]" Plaintiff Patrick Harrington requested that NCS "provide an accommodation" to L.H. by transferring him to a different kindergarten classroom. (*Id.* ¶ 65). L.H. did not attend school from April 1 through April 4, 2019. (*Id.* ¶ 69). On April 4, 2019, Defendant Bretones informed Plaintiffs that their request to move L.H. to a different classroom was denied. (*Id.* ¶¶ 70–72).

After that point, L.H. attended a different kindergarten for the duration of the 2018-2019 school year. (*Id.* ¶ 78). L.H.'s condition worsened during the summer of 2019, and the Parent Plaintiffs sought medical treatment for him. (*Id.* ¶ 80). Plaintiffs allege that L.H.'s doctors indicated that L.H. should not return to NCS for first grade. (*Id.* ¶ 81). Plaintiffs further allege

that a psychologist treating L.H. "advised that L.H. was not ready to enter a new school environment due to the severe trauma he experienced through Kern's abuse." (*Id.* ¶ 85). Accordingly, the Parent Plaintiffs decided to homeschool L.H. on a temporary basis. (*Id.* ¶ 86). Still, "[t]he situation got worse" and "L.H. became more anxious, nervous, and was scared to do his work." (*Id.* ¶ 87). In January and February of 2020, L.H. attended a residential day hospitalization program at Children's Hospital of Philadelphia. (*Id.* ¶ 92). Plaintiffs allege that as a result of Defendant Kern's abuse, L.H. has experienced "serious and permanent mental impairment[,]" (*id.* ¶ 97), and has been unable to return to a school setting, (*id.* ¶ 96).

## II.     PROCEDURAL HISTORY

Plaintiffs filed suit against Defendants in New Jersey Superior Court on February 9, 2021. (ECF No. 1, Ex. A). Defendants removed the action to federal court on March 12, 2021, invoking this Court's federal question jurisdiction under 28 U.S.C. § 1331. (ECF No. 1). Plaintiffs filed an Amended Complaint on May 7, 2021. (ECF No. 8). On June 3, 2021, Defendants filed a Motion to Dismiss the Amended Complaint. (ECF No. 11, "Defs. Mot."). Plaintiffs responded in opposition to Defendants' Motion on July 6, 2021, (ECF No. 18, "Pls. Opp'n Mem."), to which Defendants replied on July 12, 2021, (ECF No. 19).

## III.    LEGAL STANDARD

### a.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) allows a court to dismiss a complaint for lack of subject matter jurisdiction. A motion to dismiss based on lack of standing is brought under Federal Rule of Civil Procedure 12(b)(1) because standing is jurisdictional. *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). The plaintiff bears the burden of establishing subject matter jurisdiction. *Lightfoot v. United States*, 564 F.3d 625, 627 (3d Cir. 2009).

"Two types of challenges can be made under Rule 12(b)(1)—'either a facial or a factual attack.'" *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017). A facial attack "challenges subject matter jurisdiction without disputing the facts alleged in the complaint[.]" *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A factual challenge "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.'" *Id.* "In reviewing facial challenges to standing, [courts] apply the same standard as on review of a motion to dismiss under Rule 12(b)(6)." *In re Horizon*, 846 F.3d at 633.

b. **Motion to Dismiss for Failure to State a Claim**

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). The complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While "detailed factual allegations" are not necessary, a "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

IV. **DISCUSSION**

In their Amended Complaint, Plaintiffs bring federal, state, and common law claims against Defendants. *See* (Am. Compl.). Defendants move to dismiss each claim. (Defs. Mot. 8–

5

39). We start with Defendants' arguments regarding Plaintiffs' federal claims under Section 504 the Rehabilitation Act of 1973, Count IX, and Title II of the Americans with Disabilities Act ("ADA"), Count VIII.

### a. Federal Claims

Section 504 of the Rehabilitation Act ("§ 504") provides that an individual with a disability "shall [not], solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Similarly, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

### i. Lack of Standing

Defendants move to dismiss Plaintiffs' § 504 claim for lack of standing, arguing that Plaintiffs have failed to exhaust administrative remedies as required under the Individuals with Disabilities Education Act ("IDEA"). (Defs. Mot. 8–14).

"The IDEA establishes a detailed administrative mechanism for resolving disputes about whether an educational agency has complied with the IDEA." *T.R. v. Sch. Dist. of Philadelphia*, 4 F.4th 179, 184 (3d Cir. 2021) (citing 20 U.S.C. § 1415). The Act's "detailed statutory regime makes it 'clear…that Congress intended plaintiffs to complete the administrative process before resorting to federal court.'" *Id.* at 185 (citation omitted). Though Plaintiffs do not bring a claim under the IDEA, "a plaintiff bringing suit under the ADA, the Rehabilitation Act, or similar laws must in certain circumstances—that is, when 'seeking relief that is also available under' the

IDEA—first exhaust the IDEA's administrative procedures." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 750 (2017). In *Fry v. Napoleon Community Schools*, the U.S. Supreme Court explained:

> The Individuals with Disabilities Education Act…ensures that children with disabilities receive needed special education services. One of its provisions, § 1415(*l*), addresses the Act's relationship with other laws protecting those children. Section 1415(*l*) makes clear that nothing in the IDEA "restrict[s] or limit[s] the rights [or] remedies" that other federal laws, including antidiscrimination statutes, confer on children with disabilities. At the same time, the section states that if a suit brought under such a law "seek[s] relief that is also available under" the IDEA, the plaintiff must first exhaust the IDEA's administrative procedures.…We hold that exhaustion is not necessary when the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee—what the Act calls a "free appropriate public education." §1412(a)(1)(A).

*Id.* at 748. A free appropriate public education ("FAPE") "comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Id.* at 748–49 (citing §§ 1401(9), (26), (29)).

The parties agree that, under *Fry*, we "look to the substance, or gravamen, of the … complaint" to determine if Plaintiffs' suit is, in effect, seeking relief for denial of a FAPE. *Id.* at 752. "[T]hat examination should consider substance, not surface. The use (or non-use) of particular labels and terms is not what matters." *Id.* at 755. Applying *Fry*, the Third Circuit has clarified that "a court must review both the entire complaint and each claim to determine if the plaintiff seeks relief for the denial of a FAPE." *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 133 (3d Cir. 2017).

Thus, if the "gravamen" of Plaintiffs' § 504 and ADA claims[1] are a denial of a FAPE, these claims are subject to the IDEA's exhaustion requirement. Two questions guide our inquiry

---

[1] Though Defendants only challenge standing with respect to Plaintiffs' § 504 claim, their exhaustion arguments also apply to Plaintiffs' ADA claim. Because exhaustion is a jurisdictional prerequisite for a federal court to consider a FAPE-related claim, *Wellman*, 877 F.3d at 130–31 ("[T]his Court held that exhaustion of the IDEA administrative

here: (1) "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school"; and (2) "could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?" *Fry*, 137 S. Ct. at 756. If the answer to both questions is no, the complaint "probably does concern a FAPE, even if it does not explicitly say so[.]" *Id.* In addition, "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE[.]" *Id.* at 757.

The Supreme Court in *Fry* posited several hypotheticals to illustrate the application of this test. One example involved a teacher who slapped a student with a disability. *Id.* at 756 n.9. The Court reasoned that in such a case, "though the suit could be said to relate, in both genesis and effect, to the child's education" in reality "the substance of the plaintiff's claim is unlikely to involve the adequacy of special education—and thus is unlikely to require exhaustion." *Id.* On the other hand, a student with a learning disability suing a school for failing to provide a remedial math tutoring would be required to exhaust administrative remedies under IDEA, as the "essence" of such a claim is the provision of a FAPE. *Id.* at 757.

Thus, the Court must determine whether Plaintiffs' ADA and § 504 claims stem from the adequacy of the education that L.H. received at NCS. Defendants assert that "[e]ssentially what the Amended Complaint here is alleging is that the Plaintiffs were unhappy with Defendant Kern's teaching techniques, that L.H. was not thriving in the classroom, and that L.H. needed to be in a different classroom setting or receive different supports to succeed." (Defs. Mot. 11–12).

---

process is normally required for a District Court to exercise subject matter jurisdiction. … While we have some doubts as to whether IDEA exhaustion is a jurisdictional requirement, we are bound by this precedent."), we will evaluate standing with respect to both Plaintiffs' Rehabilitation Act and ADA claims.

Plaintiffs respond that their claims "ha[ve] nothing to do with the appropriateness of L.H.'s education and everything do to with L.H.'s safety and well-being." (Pls. Opp'n Mem. 9).

Both parties are correct. Looking to the Amended Complaint as a whole and the federal claims individually, it appears that Plaintiffs offer two possible theories of liability under the ADA and § 504. The first theory concerns the quality of the education that L.H. received at NCS. Plaintiffs plead that Defendant Kern refused to put in adequate effort to fulfill L.H.'s educational needs. (Am. Compl. ¶¶ 18–42, 212–14, 226–28) ("Kern has tenure at NCS, and given such tenure, she seems to have adopted a view that she needn't endeavor to teach each student in her charge, but only the ones that require minimal effort."). Under this theory, Defendant "Kern affirmatively and intentionally abuses L.H. and students like L.H., who require even the slightest individualized attention, to force those children out of her classroom[.]" (*Id.* ¶ 42). In fact, according to Plaintiffs, Defendant Kern "was actively taking measures to undermine [L.H.'s] performance" in her classroom and "exploit" his disability, (*id.* ¶¶ 215, 230), and that her behavior towards L.H. "among other things, limited his ability to learn[,]" (*id.* ¶ 63). From this perspective, Plaintiffs seem to suggest that the Board's refusal to transfer L.H. to a different classroom effectively denied L.H. access to education at NCS. (*Id.* ¶¶ 63, 66, 68). Indeed, L.H. attended a different school for the duration of the 2018-2019 school year after the transfer request was denied, at his parents' "significant additional expense." (*Id.* ¶ 78)

Applying *Fry*, we find that these allegations are subject to exhaustion. First, the allegations are unique to the school setting. Second, no adult employee at the school could have "pressed essentially the same grievance[,]" as these allegations concern a child's ability to learn in a specific classroom. *Fry*, 137 S. Ct. at 756. Finally, though Plaintiffs did not seek relief through the IDEA's administrative process, that is not dispositive. *F. S. by & through Scarano v.*

9

*Crestwood Sch. Dist.*, No. 20-3321, 2021 WL 6101356, at *3 (3d Cir. Dec. 21, 2021) (unpublished) ("F.S.'s choice not to pursue her claims through the IDEA's administrative process is not determinative of whether they concern the denial of a FAPE."). The essence of the dispute is Defendants' failure to meet L.H.'s educational needs. And as the gravamen of this set of allegations is the denial of a FAPE, exhaustion under the IDEA is necessary. Accordingly, Plaintiffs' ADA and § 504 claims are dismissed for lack of subject matter jurisdiction to the extent they are based on L.H.'s educational experience at NCS.[2]

At the same time, Plaintiffs allege disability discrimination based on Defendant Kern's alleged verbal and physical abuse of L.H.—confusingly both a cause and consequence of L.H.'s disability. (Am. Compl. ¶¶ 43–75). The allegations of abuse are analogous to the slap example in *Fry*, and therefore do not require exhaustion. *See Fry*, 137 S. Ct. at 756 n.9. Such allegations could serve as the basis for a discrimination claim against non-school public entities, and an adult NCS employee could press a claim for disability discrimination based on similar allegations of abuse. Since Plaintiffs' abuse allegations are not subject to the IDEA's exhaustion requirement, we will deny Defendants' motion to dismiss the § 504 and ADA claims for lack of standing to the extent these claims are based on Defendant Kern's alleged abuse of L.H..

### ii. Failure to State a Claim

We turn now to Defendants' argument that Plaintiffs have failed to state a claim under the ADA and § 504.[3] Plaintiffs assert that the Board discriminated against L.H. on the basis of disability in violation of the ADA and § 504 when they denied Plaintiffs' request to transfer L.H. to a different kindergarten classroom. (Am. Compl. ¶¶ 218, 235). Defendants contend that Plaintiffs have not established that L.H. has a disability. (Defs. Mot. 36).

---

[2] There is no dispute that Plaintiffs failed to exhaust administrative remedies under the IDEA.
[3] We consider these claims to the extent that they are not subject to the IDEA's exhaustion requirement.

Claims made under the ADA and § 504 are governed by the same standards, so the Court may address these claims together. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013) (citing *Chambers* ex rel. *Chambers v. Sch. Dist. Of Phila. Bd. Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009)). To succeed on an ADA or § 504 claim in the education context, a plaintiff must demonstrate that he or she: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability."[4] *Id.*

As to the first element, the ADA defines a "disability" as, *inter alia*, "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(1)(A). The Rehabilitation Act's implementing regulations define a "handicapped" individual, or one with a disability, as one who "has a physical or mental impairment that substantially limits one or more of the major life activities[.]" 34 C.F.R. § 104.3(j)(1). A mental impairment is "[a]ny mental or psychological disorder such as…emotional or mental illness…." 28 C.F.R. § 35.108(b)(1)(ii); 34 C.F.R. § 104.3(j)(2)(i). Major life activities include learning. 42 U.S.C. § 12102(2)(A); 34 C.F.R. § 104.3(j)(2)(ii). "Merely having an impairment does not make one disabled…. Claimants also need to demonstrate that the impairment limits a major life activity." *Walker v. U.S. Sec'y of the Air Force*, 7 F. Supp. 3d 438, 452 (D.N.J. 2014) (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002)).

To sustain their ADA and § 504 claims, then, Plaintiffs must show that L.H. had a disability at the time that the Board denied the accommodation request. *See Pahlavan v. Drexel Univ. Coll. of Med.*, 438 F. Supp. 3d 404, 418 (E.D. Pa. 2020) (holding, in the context of a Title

---

[4] A plaintiff alleging a violation of § 504 must also "demonstrate that the violation was committed by a program or activity receiving 'Federal financial assistance.'" *Muhammad v. Ct. of Common Pleas of Allegheny Cty., Pa.*, 483 F. App'x 759, 762–63 (3d Cir. 2012).

11

III claim, that "[t]emporally, a court's determination of whether a person is a qualified individual with a disability … must be made by focusing on the relevant timeframe in which the alleged discriminatory decision was made"). Plaintiffs assert that L.H. has a mental impairment, (Am. Compl. ¶¶ 209, 223); specifically, they state that L.H. suffers from severe anxiety, depression, and emotional distress, (*id.* ¶¶ 15, 81, 90). They allege this impairment "manifested" sometime during the 2018-2019 school year "due to Kern's continuous and pervasive abuse[.]" (*Id.* ¶ 233); *see also* (*id.* ¶¶ 93, 217). It appears Plaintiffs are attempting to advance a theory that L.H.'s mental impairment has substantially limited his learning. (*Id.* ¶¶ 87–90).

We find that Plaintiffs fail to allege facts showing that L.H. had a disability at the time that their request for transfer was denied. Though they allege that L.H. was "traumatized and severely frightened" due to Defendant Kern's behavior, (*id.* ¶¶ 43–57), the *only* mention of the impact of L.H.'s alleged mental impairment on his learning or any other major life activity *during the relevant period* is an allegation that Plaintiff Patrick Harrington told Defendant Bretones at their March 29 meeting that L.H.'s mental health issues were, "among other things," limiting his ability to learn, (*id.* ¶ 63). This vague allegation, devoid of any factual support, is insufficient to establish that L.H. had a disability as defined in the ADA or § 504 at the time the Board denied Plaintiffs' transfer request, as are Plaintiffs' conclusory statements that Defendant Kern rendered L.H. disabled.[5] (*Id.* ¶¶ 217, 232).

This conclusion is bolstered by Plaintiffs' own allegations regarding L.H.'s abilities and academic performance during the relevant period. Plaintiffs describe L.H. as "eager to learn" and "fully capable of mastering all materials which were presented to him." (*Id.* ¶¶ 24–25). Indeed, Plaintiffs assert they were "shocked" to hear from Defendant Kern in February 2019 that L.H.

---

[5] Most of the facts supporting the claim that L.H. had a mental impairment that impacted his ability to learn occurred after L.H. left NCS in early April 2019—after the alleged discriminatory act. (Am. Compl. ¶¶ 69–70, 80, 85, 92).

12

was doing poorly in school. (*Id.* ¶ 19). As late as March 20, 2019, a mere nine days before they requested the transfer, Plaintiffs continued to firmly resist the idea that L.H. required formal academic supports. They state unequivocally that "there was no basis for the referral to the child study team[,]" alleging that L.H.'s academic performance issues were "concocted[.]" (*Id.* ¶ 38). Taken as true, these facts undermine any theory that L.H.'s alleged impairment was substantially limiting his ability to learn at the time Plaintiffs' transfer request was denied.

It seems to the Court that Plaintiffs are essentially restating their tort claims couched in the language of disability discrimination. Because Plaintiffs have failed to satisfy a necessary element of an ADA and § 504 claim, Counts VIII and IX must be dismissed.

### b. State and Common Law Claims

Having determined that Plaintiffs' ADA and § 504 claims must be dismissed, we decline to exercise supplemental jurisdiction over Plaintiffs' remaining state and common law claims. Pursuant to 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim…if… the district court has dismissed all claims over which it has original jurisdiction." Generally, "where the claim[s] over which the district court has original jurisdiction [are] dismissed before trial, the district court *must* decline to decide the pendent state claims" unless "considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification" for retaining jurisdiction. *N. Sound Cap. LLC v. Merck & Co.*, 938 F.3d 482, 494 n.11 (3d Cir. 2019) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)) (alterations in original).

Here, Plaintiffs have invoked federal question jurisdiction pursuant to 28 U.S.C. § 1331.[6] (Am. Compl. ¶ 7). However, we have dismissed the only claims over which this Court had

---

[6] Because there appears to be a lack of complete diversity of citizenship between Plaintiffs and all Defendants, (Am. Compl. ¶¶ 1–6), this Court cannot exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

13

original jurisdiction. Plaintiffs' remaining causes of action raise only state and common law questions, (*id.* ¶¶ 118–205, 237–42), and we can see no compelling reason to retain jurisdiction over these claims. Though discovery is underway, this case is still in the early stages of litigation, and there is no indication that either party would be meaningfully inconvenienced by remand back to state court, where Plaintiffs originally filed this action. *See Gavin v. Bd. of Educ., S. Orange-Maplewood Sch. Dist.*, No. CV2009191KMJSA, 2021 WL 1050364, at *5 (D.N.J. Mar. 18, 2021) (declining to exercise supplemental jurisdiction over a plaintiff's state law claims since "[t]he case is in its earliest stages, at the motion to dismiss stage. Any discovery that has occurred will not be wasted if the action is refiled in a state court that possesses jurisdiction."). Absent a curative amendment to their federal claims, Plaintiffs' remaining claims, Counts I, II, III, IV, V, VI, VII, and X, shall be remanded to the Superior Court of New Jersey.

## V.    CONCLUSION

For the reasons contained herein, Defendants' Motion to Dismiss (ECF No. 11) is **GRANTED in part**. This matter shall be **REMANDED** to New Jersey Superior Court. An accompanying Order will issue.


Dated: 03/21/2022                                            /s/Robert B. Kugler
                                                             ROBERT B. KUGLER
                                                             United States District Judge